1WOODARD, Judge.
On January 27, 1999, Ms. Connie Chavis filed a disputed claim for workers’ compensation benefits for injuries from her fall while working at the Northrop Grumman Corporation (Northrop) facility in Lake Charles, Louisiana. After a trial, the WCJ held that she had proved that her fall precipitated fibromyalgia but had not proved that she was unable to return to light duty work. Ms. Chavis appeals the latter part of the decision, which we reverse, holding that she is disabled from employment, while Northrop appeals the former part, which we affirm.
Northrop employed Ms. Chavis at the time of her fall on October 16, 1997. While walking across a concrete floor there, she tripped and fell, injuring her right shoulder. After physical therapy proved to be unsuccessful, she underwent rotator cuff surgery on her right shoulder on December 2,1997.
In the next months and years, several doctors saw her for her generalized complaints of pain. Ultimately, a specialist in the field diagnosed her as suffering from fibromyalgia/chronic fatigue syndrome and linked it to her fall. Fibromyalgia is defined as a chronic condition characterized by fatigue and widespread pain in the fibrous tissues in your muscles, ligaments and tendons.[1]
On January 27, 1999, Ms. Chavis filed a disputed claim for workers’ compensation benefits, seeking an electric wheelchair scooter, prescription drugs, travel costs to visit Dr. Patricia Salvato in Houston, Texas, and penalties and attorney’s fees. When Northrop answered the claim, it admitted that there was a work-related accident, which caused a right shoulder injury, but denied that the accident had caused her other health problems. In fact, it later filed a supplemental answer, stating that she had recovered sufficiently from her job-related injuries to return to work and was no longer entitled to weekly benefits. The parties then conducted discovery. The WCJ heard the case on July 19, 2000, ruling on October pl7, 2000. She held that Ms. Chavis had proved that her fall at work had precipitated her fibromyalgia but that she had failed to prove that she was unable to return to light duty work.
Ms. Chavis appeals the finding that she is capable of returning to light duty work. Northrop appeals the holding that a work-related injury caused fibromyalgia/chronic fatigue syndrome.
This is a manifest error case. In Clophus v. Taco Bell Corp./Hot ‘N’ Now, *1219 Inc.[2] this court explained:
The supreme court recently discussed the standard to be applied in reviewing factual findings in a workers’ compensation case in Chaisson v. Cajun Bag & Supply Co., 97-1225, p. 8-9 (La.3/4/98); 708 So.2d 375, 380-381 (citations omitted) as follows:
Factual findings in worker’s compensation cases are subject to the manifest error or clearly wrong standard of appellate review. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact-finder’s conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfin-der’s choice between them can never be manifestly erroneous or clearly wrong.
Under the manifest error standard, the record supports the WCJ’s finding that Ms. Chavis was suffering from fibromyalgia/chronic fatigue syndrome, which her work related injury (the fall) precipitated. However, the record does not support the holding that she could return to light duty work. Therefore, that finding is manifestly erroneous. Important to our analysis is the fact that our jurisprudence accords superior weight to Ms. Chavis’ treating physicians over those who examined her for litigation purposes only[3] and that, obviously, those who are experts in a particular specialty are more qualified to diagnose a condition in their area of expertise than are those who are not experts in that field.
l3We chronicle Ms. Chavis’ diagnoses and treatment, beginning immediately with Dr. Kevin Schlamp’s treatment, which followed her October 16, 1997 fall. He placed her arm in a sling and referred her for an orthopedic assessment. Subsequently, an orthopedic specialist, Dr. Nathan P. Cohen, examined her on October 16, 1997. She complained of pain with any attempted motion. He testified that he had been unable to perform a thorough examination when he first saw her, because of her pain. He asked her to return in five days, which she did on October 21, 1997. However, x-rays did not reveal anything. Following that visit, Dr. Cohen reported to the employer that if a light duty job were available and she could sit comfortably at a desk and not use her right arm, he thought she could return to work anytime. He believed that she would benefit from physical therapy, which she attended. When he saw her on October 29, 1997, he found that she was still symptomatic and continued her on physical therapy. Her pain was global, but he could not pinpoint it. She complained of elbow problems, but the evaluation did not reveal anything. However, he explained that immobilizing the shoulder could have caused it. He also, scheduled an MRI, which revealed an abnormal signal in the supras-pinatus tendon, compatible with a tear; a marked increased signal in the biceps tendon sheath region, which may represent a tear or degenerative change; joint effusion with marked distention of capsule; and an abnormal signal in the greater tuberosity, which may represent degenerative or a post-traumatic change.
When Dr. Cohen examined her on November 6, 1997, he deemed that she was a suitable candidate for operative management in the form of arthroscopic surgery with a potential for open rotator cuff and biceps tendon repairs. However, five days *1220 later, he was reluctant to proceed with surgery until Dr. James D. Perry had examined her in order to rule out an axial spine problem.
Dr. Perry examined her that same day. Ms. Chavis had complained of right arm and neck pain for the last three to four weeks. He recommended a cervical MRI, which she had. He re-examined her on November 13, 1997 and felt that the neck pain could be treated conservatively and that Dr. Cohen could proceed with the surgical repair of her rotator cuff tear.
Dr. Cohen operated on her on December 2, 1997. The next day, the hospital discharged her. On December 9, 1997, he examined her and found her incisions to be clean with no evidence of infection. She could begin physical therapy at home. |4He saw her, again, on December 18 and 23, 1997. On the 23rd, he cleared her to go to rehabilitation because her shoulder was much improved, and she was comfortable; however, she complained of neck pain, for which she was seeing Dr. Mool P. Nigam. Approximately three weeks later, Dr. Cohen found her shoulder to be quiescent and that she could go to Advanced Rehab Services, noting that she is still seeing Dr. Nigam for her neck. From January 14, 1998 through February 9, 1998, every three to four days, she attended Advanced Rehab Services physical therapy.
On February 11, 1998, Dr. Cohen saw her and determined that she had failed to show any improvement to the right shoulder active range of motion. He ordered an Arthrogram to assess the degree of rotator cuff integrity, which she had on February 18, 1998. He also observed that she had an abnormal gait pattern and that where she was previously unconcerned with hip pain, in comparison to her shoulder pain, now, she had become concerned about her hip. He felt that she may be a candidate for an MRI on her low back.
When he examined her, on February 25, 1998, since the Arthrogram disclosed rota-tor cuff insufficiency, he discussed a re-arthroscopic evaluation with her and felt that her condition may warrant other doctors’ surgical review. Additionally, she had multiple complaints of her neck and low back and began to complain of left shoulder pain, stating that she may have injured her left shoulder, as well, in the fall. He testified that if somebody falls, there is always a possibility of having neck pain associated with shoulder pain; however, her x-rays had not revealed anything at the time of her first visit.
Dr. Cohen testified that from the very first day, her pain seemed to be insurmountable and intolerable in the usual fashion; she was having increased complaints more than the average individual and symptoms that appeared to outweigh objective indications.
On March 11, 1998, Dr. William D. Foster, a neurosurgeon, examined her. He found that she had probable right carpal tunnel syndrome, which trauma had caused, as well as bilateral rotator cuff problems, a cervical disc with radiculopa-thy, and a lumbar strain with radiculopa-thy. He could not exclude a herniated lumbar disc and recommended a complete myelogram, CT scan, and outpatient physical therapy and/or pain management for the neck and low back.
|,¡At Dr. Foster’s request on April 6, 1998, Dr. Scott D. Mills admitted Ms. Chavis to the Lake Charles Memorial hospital for a cervical myelogram with a CT scan, which revealed mild ventral impressions along the thecal sac at C6-7 and C7-Tl. Dr. Foster found that her pain had failed to improve with conservative management, and after reviewing her studies, specifically the myelogram and CT scan, *1221 he discovered numerous abnormalities, which he said correlated well with her complaints. On April 14,1998, he wrote to the employer, suggesting that she undergo pain management under Dr. Kevin Gorin’s direction and opining that “should she fail to improve, I see no other option as far as surgery is concerned, except to approach the problem posteriorly.”
Dr. Gorin is board certified in two spe-cialities — physical medicine and rehabilitation, as well as pain medicine. He appraised Ms. Chavis on April 22, 1998 and diagnosed her with post-traumatic myofas-cial pain syndrome and bilateral rotator cuff arthropathy-status-post repair on the right shoulder. However, he believed that her subjective complaints exceeded objective findings. Dr. Gorin concluded that she had an adjustment disorder with possible psychological factors, affecting her physical condition and stated, “currently she is not fit for duty. I would expect a duration of treatment not to exceed 120 days with an expected release to return to employment at her job of inquiry.”
At Northrop’s request, on May 27, 1998, Dr. Jack A. Hurst, a neurosurgeon, evaluated Ms. Chavis. He reported, “On physical exam I find this woman to have features that appear older than her stated age. Fair historian. 285 pounds. While describing many of these pains, she is laughing. Tremulous. This woman has no focal motor or lateralizing neurologic sign or deficit. This lady’s clinical neurological presentation is a hoax. She presented with most unusual functional overlay, numerous subjective complaints, but no objective neurologic findings to support same.” We note that Dr. Hurst saw Ms. Chavis but once and was not her treating physician.
Dr. Gorin re-examined her on May 28, 1998. He discovered that medication was not working or improving her condition, and she had had two sessions of aquatic therapy, which had put her in pain. Notwithstanding, the employer denied her request for paraspinal trigger point injections. Dr. Gorin noted that if those injections were |finot approved, the patient will have achieved a maximum medical improvement status from a comprehensive pain management and rehabilitation standpoint.
In June of 1998, Ms. Chavis saw Dr. Charles Murphy, a board certified psychiatrist. He diagnosed her with major depression and anxiety. Dr. Murphy blamed her conditions on chronic pain and confirmed that she was not malingering. He found her to be well groomed but labile. On July 3, 1998, she admitted herself into the hospital on his orders after she told him that she was at the end of her rope, felt like she was about to lose control, could be on the verge of an emotional breakdown, and was having suicidal thoughts. At her next appointment, she was alert and responsive. He recognized that she was under a great deal of stress during the period in which he saw her— her husband had a heart attack and a stroke, her marriage was falling apart, she had good days and bad days. He noted that she has continuously taken anti-depressants and anti-anxiety medication and that she was depressed the entire time that he saw her. He did not believe that she was capable of any kind of physical or manual work because of pain and stated, “I think she’s disabled. I would say she’s disabled. I think that her concentration— her ability to concentrate to attend to the task related activities is very limited based upon her pain.” He described her as intelligent, smart, and wanting to be functional. Dr. Murphy believed that the prospect of her returning to a manual labor job would devastate her because of her depression *1222 and anxiety and that one could anticipate that they would worsen.
When Dr. Gorin examined her on June 30,1998, he observed:
She’s not attending her aquatic therapy as prescribed; she is not compliant with treatment; there’s no evidence of any progressive neurologic dysfunction or neuromusclar deterioration appreciated; after informed consent was obtained, the bilateral superior trapezius and right sacroiliac joint regions were cleansed in a sterile manner. There was definite relief of pain at the sites injected. She has a permanent partial disability and remains functional at a physical demand level of light duty as defined by the Dictionary of Occupational Titles.
He concluded that she could return to employment as an IMPCA computer facilitator or an electrical aircraft trainee, the two job descriptions which the employer had provided him for review.
17Essentially, Dr. Gorin testified that, generally, someone who, has pain everywhere you press presents subjective, not objective findings, and that subjective findings are usually seen with underlying or overlying psychological factors. Specifically, he believed that there was evidence of an adjustment disorder with psychological factors affecting her physical condition and conclusively found that she was depressed and anxious, stating that it is not uncommon for depression and anxiety to cause or mimic symptoms of chronic pain, as well as to amplify symptoms. Dr. Gorin cautioned, however, that this did not mean that she was malingering. He postulated that the best thing for her would be to participate in an aggressive wellness and fitness program. He remarked that, in addition to her own problems, her husband had been diagnosed with a parotid tumor and some type of mild stroke and was having surgery. Basically, he thought that she was at maximum medical improvement, had a permanent disability, and was at the light duty level.
On August 10, 1998, Dr. Arthur W. Pri-meaux, a family practice physician, examined her. Opining that she “needs workup and treatment for possible fibromyal-gia,” he referred her to Dr. Patricia Salva-to, a Houston specialist in this field.
Dr. Salvato was her treating physician for the fibromyalgia as late as the date of the filing of her claim. Dr. Salvato stated in her September 23, 1998 letter that,
Based on the Center for Disease Control (CDC) criteria, Ms. Chavis has been diagnosed with Chronic Fatigue Syndrome/Fibromyalgia. She continues to experience debilitating symptoms and her health status has compromised her ability to tolerate work stressor and schedules, maintain regular attendance on the job or be punctual within customary tolerances, interact appropriately with co-workers or complete a job tasks [sic] in a timely manner.
She explained that “[a]lthough it is unknown what causes CFS/fibromyalgia, it is known that stress can exacerbate the symptoms of these conditions” and that, specific to Ms. Chavis, “[t]he work injury of 10/16/97 was more than likely a precipitating factor.” On October 26, 1998, she elaborated, “In my professional opinion, Ms. Chavis is 95% disabled as a result of her severe fibromyalgia/chronic fatigue syndrome.” Dr. Salvato characterized her prognosis as “guarded.”
[sOn September 30,1998, Dr. Foster saw Ms. Chavis again. She complained of neck and bilateral arm pain and had some sort of tremor in her right hand. He found Ms. Chavis to be sincere, having a number of problems. Dr. Foster believed that her symptoms were magnified because she had been so depressed and had obtained abso *1223 lutely no relief from any of her treating physicians. In fact, she no longer wanted to see Dr. Gorin. He suggested that another doctor evaluate her.
Mr. Allen Grayson Simmons, a vocational rehabilitation consultant with a Master’s Degree in Vocational Rehabilitation Services and sixteen years experience, examined Ms. Chavis, beginning on April 6, 1999. He testified that he works with people who have various types of impairments, either psychological, physical, or both, and determines how that impairment or disability affects a person’s employability and future earning capacity. Mr. Simmons saw Ms. Chavis three times, two to three hours each and observed that she ambulated very carefully and very slowly with the assistance of a cane that had a foot-stand on it. She told him that she had problems with her vision. After she had a vision examination, and her prescription was increased to enhance her reading, he did the vocational testing. Mr. Simmons perceived that she had grasping, turning, and manipulating problems with her right hand and that she had some problems grasping, turning, and manipulating small pens with her left hand but could manipulate them better with her right. Based upon her educational level and work history, he expected that her performance would have been higher, if she had not been experiencing the degree of pain that she exhibited. Assimilating the information which he had received with that from his interaction with her, he asserted that she was totally and permanently disabled from any from of gainful employment, which would be based on a physical, or exertional, disability and a non-exertional, or psychological, disability. In other words, he ascertained that she was unemployable.
On June 6, 2000, Northrop scheduled Ms. Chavis for an Independent Medical Evaluation with a psychiatrist, Dr. James M. Anderson. He examined her for a mental disorder and found major depression in remission, marijuana abuse in remission, fibromyalgia/chronic fatigue syndrome, myofascial pain syndrome, obesity, chronic pain, financial problems, marital problems, and child problems. Dr. Anderson ruled out dysthymic disorder— morbid anxiety and depression accompanied by obsession. He remarked that Ms. Chavis had expressed mild irritation at having to participate in 19the evaluation but became more engaged and cooperative. Physically, he observed that she had difficulty standing from a seated position, as it appeared to cause her physical discomfort, and that she moved, slowly, in a shuffling broad-based gait. Dr. Anderson saw no dementia- and depicted her to have a mild mood disturbance and minimal to moderate anxiety. He hypothesized that she may use physical complaints to influence or manipulate other people and that her personality make-up was consistent with having a psychological basis to her symptoms but that she was not motivated for psychological change at this time. He decided that her fall at work had caused her depression and that she was not disabled from work because of a psychiatric disorder. He found that she was not malingering.
Following Ms. Chavis’ complaint, diagnosis, and treatment course from her fall until the trial and synthesizing all of the information in the record within a manifest error rule context, we find that the evidence, from those who are most qualified to give it, overwhelmingly proves that she suffers from fibromyalgia, which her fall precipitated, and that she cannot work in any capacity, primarily, due to her chronic pain and inability to concentrate, inter alia.
*1224 Specifically, concerning fibromyalgia, Dr. Primeaux, her family physician suspected it, and Dr. Salvato, a specialist in that field, diagnosed it, opining that the fall at work precipitated it. Dr. Cohen remarked that, from the very first day, her pain seemed insurmountable and intolerable, having increased complaints more than the average individual and symptoms that appeared to outweigh objective signs. No one refuted Dr. Salvato’s diagnosis or prognosis, and the WCJ, obviously, found her to be credible, as she had to use Dr. Salvato’s opinion as the basis of her finding that Ms. Chavis had fibromyalgia, which was precipitated by the fall.
Regarding Ms. Chavis’ disability and ability to return to light duty, her treating physicians, Drs. Salvato’s, and Murphy’s, as well as Mr. Simmons’ opinions, all, concluded that she is disabled and not able to return to work. Although Dr. Gorin believed that she could perform some form of light duty work, he based his conclusion, purely, on her physical function. Apparently, he did not factor into his analysis her inability to concentrate and discounted the effect of her chronic pain on her ability to function physically. Although, he emphasized that he was not saying that she was malingering, he seemed to think that her complaints of pain were over-blown and that psychological factors affected them.
1, Notwithstanding, fibromyalgia, a condition, which, presumably, Dr. Gorin was not aware of, could explain Ms. Chavis’ pervasive, unexplainable pain, and had he known about it, his conclusion may have been different. Regarding potential psychological interplay, with all due respect to Dr. Gorin, we believe that a psychiatrist is more qualified to make that determination. Dr. Murphy, a psychiatrist, opined that it was her pain that interfered with her ability to concentrate, on task related activities, thus, rendering her disabled from employment. And, Northrop’s IME, Dr. Anderson, also a psychiatrist, specifically commented that she was not disabled because of a psychological disorder and that she was not malingering. Nor did any of the other health care providers find her to be malingering, except for Northrop’s neurological surgeon, Dr. Hurst, who deemed her “clinical neurological presentation a hoax.” Importantly, he saw her only once and never treated her. Furthermore, his opinion appears to be hostile and one-sided.
All of the evidence in the record overwhelmingly proves Ms. Chavis’ contentions that she suffers from fibromyalgia, stemming from her fall at work, and that she is totally disabled from working in any position. We find that the record establishes that Ms. Chavis has proved in accordance with La.R.S. 23:1221(2)(e) “by clear and convincing evidence unaided by any presumption of disability that [she] is physically unable to engage in any employment, or self employment.” Thus, we affirm the WCJ’s finding of fibromyalgia and the fall at work having precipitated it, and reverse her decision that Ms. Chavis is capable to return to light duty work.
CONCLUSION
We affirm that part of the WCJ’s decision which held that Ms. Chavis suffered from fibromyalgia from a work related injury but reverse the finding that she is employable for light duty. We find that Ms. Chavis is disabled from employment, due to her fall at work on October 16, 1997, and cast Northrop with all costs.
AFFIRMED IN PART AND REVERSED IN PART.

. 2001 Mayo Foundation for Medical Education and Research (MFMER). http://www.personalogic.aol.com/?product=illness,aol,aol & custId=fibromyalgia & custMode=overview. See also Webster’s Medical Dictionary (1996), and The Merck Manual of Diagnosis and Therapy, (17th ed. 1999).

. 98-1794, p. 3 (La.App. 3 Cir. 3/31/99); 732 So.2d 692, 694.

. Ben v. Holtrachem, Inc., 00-635 (La.App. 3 Cir. 11/14/00); 772 So.2d 326.